Final argument of the morning, it's in Appeal No. 23-2269, Donald Artz v. Hartford Life & Accidental Good morning, and may it please the Court, my name is Mark Dabofsky, I represent the Plaintiff Appellant, Donald Artz. Most of the major facts in this case are not in dispute. There is no dispute that Mr. Artz suffers from multiple sclerosis, that he was diagnosed with that condition in 2003, and that it significantly worsened between that date and the date when he stopped working. There's also no disagreement whatsoever that Mr. Artz would not be able to perform any occupation for more than eight hours a day, and that as well, the medical evidence is undisputed that Mr. Artz would only be able to work Monday through Friday during daylight hours. Where the parties differ is whether Mr. Artz could perform his occupation with those limitations, eight hours a day, no more than that. And we contend that based on the evidence in the record and a number of other factors that are undisputed, that Mr. Artz would not be able to perform his occupation given the limitations caused by his multiple sclerosis. I want to make sure that I appreciate, is it the not able to do the job beyond eight hours, or not able to do the job beyond four? I just want to make sure that I understand the argument that's being made. Because it's the working shifts. Right. So, I think both sides of Your Honor's question are actually correct. Okay. We have taken the position that the occupation requires 12-hour rotating shifts. Okay. We've also taken the position that the occupation requires emergency response, requires overtime and weekend work. Mr. DeBofsky, can I pause you on this? Because I think you got your finger right on it in your colloquy with Judge Pryor. So, I know on appeal you have brought to us the document from the Bureau of Labor Statistics, but we've got to consider what the record was before that. So, if we set that, and even that says 8 to 12, but if we set that aside, in the administrative appeal, right? So, after Hartford, with its initial denial on June 5 of 2020, it's a reasoned denial. So, you saw it. You went through it. Your client did. Went through it. My question is, what did the appellate administrative record contain with respect to the essential duties of this job generally? Yeah. Not the way WEC Energy had structured the job, but more generally. And focus on the administrative appellate record. Certainly. First of all, we do have the job description that was provided by Wisconsin Energy. We also have the occupational assessment that was performed by Julie Byrd. And going right to the heart of what we're contending in this case, that occupation did not meet the requirement set forth in the O'Reilly versus Hartford case, another Hartford case, by this court, which said that there has to be a reasoned inquiry into whether the claimant has the vocational capability of performing the job. If you look at Ms. Byrd's assessment, which is in the record at, I'll find it in a second. You're talking about this, just to save you time, you're talking about this here, this thing? That's the document. Yeah. It's bait stamp 257, 258. Correct. Yeah. So, Ms. Byrd performed that assessment in June of 2022. Right. That was after Hartford had collected the medical records from Dr. Cattry and from Dr. Leach, their own consultant, who agreed with the neurologist that Mr. Arts was only limited to working eight hours a day, daylight hours, Monday through Friday. Ms. Byrd purports to compare the Wisconsin Energy job description to how the occupation is performed in the national economy. She makes no consideration whatsoever of the emergency, on-call, weekend work, or rotating shifts. There is no evidence in the record to support Hartford's conclusion that Wisconsin Energy's requirement of 12-hour shifts was something that was not consistent with the national economy. It's not contained in Ms. Byrd's report. There is no evidentiary support for that conclusion anywhere in the record. It's just a conclusion that Hartford made, that what Wisconsin Energy requires of 12-hour shifts is not the industry norm. But Ms. Byrd's assessment was grossly deficient because she did not consider the other factors, including significantly the addendum that Dr. Leach prepared before Ms. Byrd did her assessment that indicated that the job was... So is your position then that, is your position that, no, I'm not arguing essential duties in occupation. I'm not violating the kind of definitional parameters by arguing that exactly what was required at WEC Energy is the national norm. Okay. So I'm not doing it that way. But what I am saying is that what Mr. Hart was doing at WEC Energy does reflect what, what's it called, power distributors? Yes. Yeah, what power distributors, you know, do for energy companies. In other words, around the country, they don't work 8-hour shifts. They do have emergency call responses, et cetera. Is that, that's the point? That is the point. And it's just intuitive because anybody who is controlling the distribution of power, everybody expects that power is going to be delivered 24 hours a day, 7 days a week. Well, I don't know that it's intuitive in either direction, honestly. I mean, I don't have an intuition about what a power distributor does. Okay. I mean, what you say may, the only point of my observation is that it seems amenable to answering by evidence. Right. Another, we should be able to discern what they do and not answer it on the basis of intuition. And I agree with that. But since Ms. Bird purported to indicate what the job entails in the national economy, by not looking at the factors that are listed in Wisconsin Energy's job description and saying, oh, this isn't part of the national economy, that's not part of the national economy. That's exactly why I asked you at the appellate stage of the administrative proceeding. Right. You're well aware of what's happening in the, or I don't know, did you represent him? I did not. Okay. So, if Ms. Bird's counsel was well aware of what was going on, did that counsel come back and say, this is insufficient, this is based upon assumption, intuition, something other than evidence, because it's just not right? What prior counsel primarily argued was that Ms. Bird's claim that the occupation, or Ms. Bird's assessment, was not representative of the national economy. And that the assertion made by Hartford that... Did he or she, though, back that with an evidentiary showing? Unfortunately not. Okay. But still, we continue to maintain that a reasonable locational inquiry would have required that. Okay. And I'm running out of my time, but I would just like to make the point that this court decided the Scanlon versus Life Insurance Company of North America case last year. And the Scanlon case has a number of observations that are relevant to this case. Scanlon cited two prior decisions. One is the McFarland case, which we cited in our brief. The other one is Majeski versus MetLife, 590 Fed Third, 478 from 2019. And both of those cases really pretty much say the same thing. That if there is an occupational determination that does not take into consideration all of the requirements of the job, including how many hours the job needs to be performed, that such a vocational assessment is inadequate and that requires overturning the disability benefit determination. I have very little time, but I thought... We're going to give you some time. We drilled down on this factual point, so don't worry about it. I'll give you a couple minutes. Thank you. You're welcome. Hearing... Good morning. Good morning. May it please the court. Jacqueline Herring on behalf of Hartford Accident and Life Insurance Company. And to... Maybe we should start where we left off in the last conversation. Yeah. Yes. That definitely seems to be a key issue for the panel. And I think that then comes down to whose responsibility is it to prove Mr. Arts' case? And once the administrator says, here's what the decision is, providing the entire file, here's the basis on which we made that decision, he then has an opportunity. It's kind of the entire purpose of an administrative appeal is for him to say, here's why I think you are wrong. Here is the counter evidence that I have. Here's what concerns me, though. I thought that's what you would argue, okay? And it's fair. It's fair. It's clear. I can't figure out for the life of me where the kind of baseline assumption of a 40-hour week spread across 8-hour shifts comes from. I can see it in the initial denial letter. It's right there. It's on the page. Okay? That's definitely the baseline assumption. But where does it come from? I think it generally comes from the plan language. And the plan language that specifically defines essential duties. And there's three specific But that's not shift. That doesn't have anything in it about shift lengths. Which is kind of exactly right. The three things that make something an essential duty is it has to be substantial, not incidental. It has to be fundamental or inherent to the occupation. That's a key consideration here, the idea that a particular shift is so fundamental and inherent to the occupation that it redefines the Why didn't somebody just explain that? I'm sorry? Why does it take us to get to the Seventh Circuit on appeal before we have a discussion like that? In other words, it sure would have helped if somebody just would have wrote a sentence like that. That we're well aware that WEC Energy has structured this for power distributors to work 12-hour shifts. But our look at this position nationally does not establish that that's an essential duty at all. Or fundamental or inherent in the occupation. And therefore, our baseline is going to be a 40-hour work week at 8-hour shifts. It sure would have helped if somebody would say that. And I get the point on that. But, again, I think it's clear from the decision that plaintiffs then had an opportunity to appeal. It's clear from the decision that that is the basis for the decision. That they're looking at. And, again, the plan language on this is really clear. If we were talking about an emergency room physician, you say, well, 8 hours, 40 hours a week. That's a full week. What we would need to do is, number one, look at your ability to work the number of hours in your regularly scheduled work week. So, in your example, we have an emergency physician that works 50 hours. That would be different. I guess that kind of loops back to what defines it as 8 hours. If it's not the physician working the ER, what defines it as 8 hours in a day for this profession? And I think it was less about defining it as an 8-hour day and more about what the plan says. The timing limit in the plan is the number of hours in your regularly scheduled work week. And I think it was a more global look at what are the regularly scheduled hours. I think it has to come down to, I think what you're saying is there's no specific evidence that explains it. It is a background assumption that full-time work translates into one 40-hour total work week. It's divided across 5 days and 8-hour shifts. I think that's, I don't know what else it could be. No, Your Honor. Again, the idea is, what is your regularly scheduled work week? And Mr. Arts' regularly scheduled work week was actually less than 40 hours. But I think because his doctor said he could do 8-hour shifts, what the company then looked at is, can he do the number of hours in his regularly scheduled work week? And he can in 5, 8-hour shifts. What's your best, other than standing here and arguing that, what's your best evidence that that's the way the decision was made? I think the decision language itself. Okay, what language? Because your articulation of it is a lot, when I read the letters, there's a lot of fog in them. I understand what you're saying, but what I'd like to ground is the decision that's made. I think part of that, Your Honor, in the Appeal Uphold Letter, which is the one that starts at 325, I think there's language on page 330 that addresses that. It addresses what your occupation is and the distinction between what may have been required by an individual employer versus what the plan requires. I know what you're talking about. I have it in my hand. That seems to me to be recounting the definition. I mean, we don't have to keep, I mean, I don't want to waste, blow your time with that, but it's a serious point because you have an individual that has MS. Nobody can test that. As MS progresses and as he's experienced, serious fatigue can tend to set in. He says, look, I can tell you all about what power distributors do because I've been doing it for a lot of years and been doing it very well, and it requires working overtime daily. It's these longer shifts because of the nature of the work. And then in response to that, it looks to me like the administrative record just says, well, we're going to go with the baseline assumption of a 40-hour work week spread across eight-hour shifts, and we're not going to tell you how that assumption relates to the work of power distributors. It's like there's silence or an assumption in response to his position. That's what's unsatisfying. And I think one of the distinctions, Your Honor, he wasn't working 12 hours every day. And what the plan says is he's working 12-hour shifts, three days a week, 36 hours. But if you ask him, and I think he's been as clear as day, the 12 is important in doing this work. Actually, he specifically said he could do it in eight, and he asked the company to accommodate him doing it in eight, even after some of the other doctors said you're limited to four when he had the occupational therapist. Where's that at in the record? I believe it's page 13. Let me just double-check my site. But, yes, he had a telephone call on December 26th with the company in which he says, I'm now being told maybe I should only work four hours a week, but I'm able to do eight if the company will allow me to do that. Okay, I know what you're talking about. Okay. It is. It's at page 13. Yeah, so, you know, there wasn't this overwhelming it must be 12, it must be 12, it must be 12. The problem was Mr. Art himself said I can do it in eight, I want to do it in eight, and the company said the way that we've got everything structured, we can't work with an eight-hour shift, we cannot accommodate that. But it wasn't that Mr. Art said I've got to have 12 hours to do my job. He agreed he could do it in eight. Pretty much all of the medical evidence agrees that he can work an eight-hour shift. No, your point is that's the way the company, I think you're right about that, that's the way the company decided to structure this particular function. Yes, and I think if you've got, you know, I don't know how many people they had rotating, but if you have 20 people rotating and you have someone else who wants a different schedule, it can be problematic when you're trying to get everybody scheduled in. But for whatever reason, the company said we cannot accommodate an eight-hour schedule. But it wasn't because it's such an inherent part of this job and it's so fundamental to the job that it's an essential duty. It was how they were doing their scheduling and what their schedule looked like. And this plan language, the essential duty language, and the definition of disability itself here are very, very specific. You have to be prevented from performing one or more of the essential duties. And in order for a duty to be essential, it has to be substantial, not incidental, fundamental or inherent to the occupation, and cannot be reasonably omitted or changed. And the temporal limit, the only temporal limit on the timing is your ability to work the number of hours in your regularly scheduled work week is an essential duty. All of those things were seen here. This is a case under arbitrary and capricious review, not de novo review like Scanion. This is an arbitrary, capricious case. Hartford is the administrator with discretion, and there is rational support in the record for Hartford's decision. The district court was correct and should be affirmed. Okay. Ms. Herring, very well. Mr. Dabofsky, we'll give you a couple minutes. There are several issues with what Ms. Herring just argued. The record is completely devoid of any evidence that the occupation could be performed on a regular basis for eight hours a day. It was just something that Hartford assumed. And one thing that hasn't been brought up yet during the oral argument is that when Mr. Arzt initially went on short-term disability salary continuation program, which had the exact same definitions of disability, essential duty, everything, as in the long-term disability plan, he applied at a time when Dr. Cottrey had indicated he could work eight hours a day, and Hartford approved the salary continuation claim. Yet they took an entirely different position when it came to the long-term disability claim without offering any explanation for that. For that reason alone, as well as the others that we've argued, we maintain that Hartford's decision was arbitrary and capricious and needs to be overturned. Okay. Very well. Thanks to both counsel. We'll take the appeal under advisement, and that wraps up the day's arguments, so the court will be in recess.